**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**William HARRIS, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 6, 2005.

Filed Nov. 16, 2005.

---

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: STEVENS, LALLY-GREEN, and KELLY, JJ.

OPINION BY STEVENS, J.:

¶ 1 Following a jury trial which commenced on November 6, 2003, Appellant, William Harris, was found guilty of Robbery[1] and Possession of an Instrument of Crime.[2] This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County on February 2, 2004, at which time Appellant was sentenced to twenty-five (25) years to fifty (50) years in prison followed by five (5) years' consecutive reporting probation, along with the requirement to pay court costs. We affirm.

¶ 2 The salient background information and procedural history was developed at the two suppression hearings and the trial held in this matter. On December 18, 2001, shortly after 9:00 p.m., Ms. Deitra Ransom was working as a cashier at a Sonoco A–Plus Market located at the intersection of Front and Oregon Streets in South Philadelphia. N.T., 11/6–10/03, at 98. Ms. Ransom noticed a man, whom she identified at trial as Appellant, peer around the corner through a window to her left. Shortly thereafter, Appellant approached Ms. Ransom as she sat behind her register, lifted his shirt to reveal a gun, and declared he "doesn't have all day." N.T., 11/6–10/03, at 99–100. He dropped a bag and Ms. Ransom proceeded to fill a different grocery bag with money from her register and that of her co-worker, Mon Mean. N.T., 11/6–10/03, at 100. Appellant fled the store with approximately eight hundred ($800.00) dollars in small currency. N.T., 11/6–10/03, at 101.

¶ 3 Officers arrived on the scene, and Ms. Ransom described the perpetrator as being approximately six-foot-two or six-foot-four, about 250 pounds and having a medium to dark brown complexion. He had an unshaven face and a cleft in his chin. He was wearing a black Raiders cap, sunglasses, a quarter length leather jacket with a hood, a white shirt, black running pants and sneakers. N.T., 11/6–10/03, at 103–104. While Ms. Ransom was unable to identify Appellant from the approximately seventy-five (75) photos she was shown on the night of the incident, she was able to identify him the next time she was contacted by police eleven (11) days later, at the Preliminary Hearing while testifying on February 25, 2003, and at trial in November of 2003. N.T., 11/6–10/03, at 106–108.

¶ 4 Ms. Mean, who had been preparing pizza at the time in question, testified that she saw Ms. Ransom take money from the

---

1. 18 Pa.C.S.A. § 3701.

2. 18 Pa.C.S.A. § 907.

former's register and hand it to a man. After the man ran from the store, Ms. Ransom explained they had been robbed, and Ms. Mean ran after him. She saw a light grey four-by-four SUV with a Chevy sign printed across its back leave the parking lot rapidly. She also believed there may have been a maroon color on the bottom of the vehicle. N.T., 11/6–10/03, at 77–79, 102.

¶ 5 On December 28, 2001, Officer Michael Washington and his partner, Officer Fairbanks, were working in the area of Broad and Washington Streets in South Philadelphia. N.T., 11/6–10/03, at 30–31. At approximately 8:40 p.m., the officers received information that a black male who was approximately 6′4″ to 6′5″ tall and wearing a blue "hoodie" had just robbed the Pep Boys store at Delaware and Washington Avenues at gunpoint and had fled the scene in a silver Chevrolet Suburban. N.T., 10/22/02, at 10–11. The officers were approximately twelve to thirteen blocks away at the time, and their attention was attracted to Appellant's vehicle because of the flash information. In addition, Officer Washington also observed a male wearing a blue "hoodie" operating the vehicle and that the inspection on the vehicle had expired July, 2001. N.T., 10/22/02, at 11.

¶ 6 The officers activated the overhead lights and air horn of their patrol car and Appellant pulled over. N.T., 10/22/02, at 11–12. Officer Washington described the vehicle as a Chevy SUV, with silver on the top portion and maroon toward the bottom. N.T., 10/22/02, at 14. As Officer Washington approached Appellant's vehicle, he saw Appellant in the driver's seat and noticed him make a movement under the seat between his legs. N.T., 10/22/02, at 13–14. Officer Washington ordered Appellant to place his hands on the steering wheel and asked him repeatedly to produce his license, registration and insurance

for the vehicle. Appellant failed to respond and made another movement between his legs. Officer Washington asked Appellant to exit his vehicle and as he did so, Officer Washington saw a silver object that appeared to him to be a gun on the floor. N.T., 10/22/02, at 14. Officer Washington brought Appellant to the back of the car and asked Officer Fairbanks to retrieve what was on the floor. N.T., 10/22/02, at 14–15. The object turned out to be a silver and brown toy handgun with black electrical tape on it. N.T., 10/22/02, at 15. Shortly thereafter, Appellant was identified by the female Pep Boys employee as the man who robbed her N.T., 10/22/02, at 17–18.

¶ 7 On December 29, 2001, Detective Anthony Catalini took an eight (8) man photo array to Ms. Ransom's residence. After studying the array, Ms. Ransom identified Appellant as the man who robbed her. N.T., 6/24/02, 8–9; 11/6–10/03 147–151. Appellant was then charged with the December 18, 2001, robbery at the Sunoco A–Plus Market.

¶ 8 On June 24, 2002, Appellant litigated a suppression motion, at which time he alleged that the Philadelphia Police Department improperly employed initial identification procedures. N.T., 6/24/04, at 3. The suppression court denied that motion.

¶ 9 On October 22, 2002, Appellant litigated a second component of the suppression motion in an effort to suppress the gun recovered from the Chevrolet Suburban. Appellant posited the police had neither reasonable suspicion nor probable cause to stop or search Appellant's vehicle on December 28, 2001. N.T., 10/22/02 at 6. The suppression court denied that component of the motion as well.

¶ 10 Beginning on November 6, 2003, Appellant was tried before a jury. On November 12, 2003, the jury convicted Appellant of robbery and possession of an

instrument of crime. Following several continuances so that it may obtain accurate information regarding Appellant's prior convictions, the sentencing court sentenced Appellant to a mandatory minimum term of twenty-five (25) years to fifty (50) years in prison pursuant to 42 Pa.C.S.A. § 9714. The instant appeal followed.[3]

¶ 11 Appellant raises four grounds for appeal. First, he claims the suppression court erred in denying his motion to suppress out-of-court and in-court identification evidence in violation of both the United States and Pennsylvania Constitutions where the photographic lineup was suggestive and tainted all subsequent identifications. Second, Appellant argues the suppression court erred in failing to suppress the sport utility vehicle and toy gun recovered from the vehicle in violation of the search and seizure provisions of the United States and Pennsylvania Constitutions, where the search was warrantless and without probable cause or reasonable suspicion. Third, Appellant contends the sentencing court lacked jurisdiction to impose an enhanced sentence of twenty-five (25) years to fifty (50) years in prison because the robbery information did not allege the prior convictions necessary for enlarging the statutory maximum. Finally, Appellant states the "three strikes" statute[4] violates the Pennsylvania and United States Constitutions. We will discuss each issue in turn.

■ ¶ 12 Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003),

cert. denied, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004). A photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *See Commonwealth v. Natividad*, 565 Pa. 348, 773 A.2d 167 (2001), *cert. denied*, 535 U.S. 1099, 122 S.Ct. 2300, 152 L.Ed.2d 1056 (2002); *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97 (1995), *cert. denied*, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). In *Johnson, supra*, the trial court reviewed the photographs and determined that the photographic arrays were not unduly suggestive and that the identifications were reliable and therefore admissible. Because the trial court's conclusion was supported by the record, the Court found there was no abuse of discretion and the appellant's claim the out-of-court identifications were tainted therefore failed.

■ ¶ 13 Our Supreme Court has determined a photographic identification is unduly suggestive when the procedure creates a substantial likelihood of misidentification. Photographs utilized in lineups will not be deemed unduly suggestive if the suspect's picture does not stand out more than those of the other individuals included in the array and the people depicted in it all exhibit similar facial characteristics. *Commonwealth v. Fisher*, 564 Pa. 505, 522–523, 769 A.2d 1116, 1127 (2001) (*citing Johnson, supra*). In that case, the Court noted the pictures were selected by a computerized system based upon similarity to the appellant and found the trial court did not abuse its discretion in reviewing and finding nothing unduly suggestive in the array.

■ ¶ 14 Herein, Appellant contends in his brief that the photo array was tainted

---

**3.** All Pa. R.A.P. 1925(b) requirements have been met.

**4.** 42 Pa.C.S.A. § 9714.

in that the original photo spread could not be produced at trial. Detective Anthony Catalini testified that on December 29, 2001, he met with Ms. Ransom at her home to show her a photo spread which contained eight black males, one of whom was Appellant. He explained that after putting Appellant's photo number into a photo imaging machine as a suspect, he went to a line display and the computer automatically picked where in the display Appellant would be and the number of matches that may be compared with the individual. N.T., 6/24/02, at 13–14. Detective Catalini testified he typically goes through hundreds of photos until he is satisfied with the resultant array. N.T., 6/24/02, at 14.

¶ 15 He explained to Ms. Ransom what a photo array was and after reviewing it for a few seconds, she identified Appellant as the male who robbed her. N.T., 6/24/02, at 9. While Detective Catalini admitted the original photo spread was not in the file and he was in the process of investigating its whereabouts, he was able to recreate the photo spread he presented to Ms. Ransom for the suppression court's review. He had listed the PPN numbers of the people he had shown to her in the order he had shown them. The only difference between the recreated photo spread and the one Ms. Ransom viewed was that the former was comprised of individual photos while the latter was all on one sheet of paper. N.T., 6/24/04, at 9–12. Appellant's picture was located first in the top left corner of the array. N.T., 6/24/02, at 13.

¶ 16 Detective Catalini stated after Ms. Ransom pointed to Appellant's photo, he made no comments regarding whether she had made a correct selection. N.T., 6/24/02, at 16. She signed a statement on which Detective Catalini wrote her response to his question "Can you tell me if you recognize anyone in these photographs" as "yes, the male who robbed me when I was working at the Sunoco two Tuesdays ago at 9 p.m." N.T., 6/24/02, at 25.

¶ 17 While reviewing the reproduced photo array, the suppression court noted "I'm looking at this photo spread, and I think it is a remarkably well composed photo spread."[5] N.T., 6/24/02, at 13. Just before the suppression court's ruling, Appellant's counsel stated the following:

> I'm not making any- based on what we heard, I'm not going to make any argument on the motion to suppress the identification at this point... Judge, I think you have to make a ruling, but I'm not making an argument.

N.T., 6/24/02, at 27.

¶ 18 In light of the above, we find Appellant's claim the photo lineup was suggestive must fail. The inability to locate the photo spread originally viewed by Ms. Ransom was cured by Detective Catalini's record regarding the photos and the order in which they were presented to her on December 29, 2001. Ms. Ransom selected Appellant's photo without any hesitation or prompting from the detective. We also note that in addition to failing to make a convincing argument prior to the suppression court's ruling on the motion, counsel for Appellant failed to bring out on cross-examination evidence of any suggestive remarks or inappropriate behavior during the presentation on the part of Detective Catalini concerning the first photograph, which was that of Appellant. Because the out-of-court identification of Appellant was not tainted, we need not address Appel-

---

5. We note that the photographs and their corresponding numbers have not been included in the record and, as such, we have not been able to perform an independent review of them.

lant's derivative assertion that the suggestive procedure tainted all subsequent identifications. *Commonwealth v. DeJesus,* 580 Pa. 303, 860 A.2d 102 (2004). *See Commonwealth v. Johnson,* 542 Pa. 384, 396–397, 668 A.2d 97, 103 (1995) (holding that where an out-of-court photo-array identification is deemed appropriate, an appellate court need not address an argument that a witness lacked an independent basis for an in-court identification).

¶ 19 With regard to Appellant's second issue on appeal, we have noted that both the Fourth Amendment to the United States Constitution and Article I, § 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures. Generally, a search is reasonable when it is conducted pursuant to a warrant supported by probable cause; however, one of the exceptions to the rule regarding warrantless searches arises where the contraband is in plain view. *Commonwealth v. Merkt,* 411 Pa.Super. 127, 600 A.2d 1297 (1992).

¶ 20 In determining whether an item was in plain view in an automobile that had been stopped when police believed a narcotics sale was in progress in the vehicle, this Court noted that when reviewing a motion to suppress evidence, our standard of review is well established:

> The admissibility of evidence is a matter addressed to the sound discretion of the trial court and... an appellate court may only reverse upon a showing that the trial court abused its discretion. [W]e consider whether the record supports the suppression court's factual findings, and the legal conclusions drawn therefrom, by reviewing the prosecution's evidence and only so much of the defense's evidence as remains uncontradicted [sic] within the context of the record as a whole. Factual findings unsupported by the evidence may be rejected, but if the record supports the suppression court's factual findings, reversal of a suppression court's actions is justified only if the inferences and legal conclusions drawn therefrom are erroneous.

*Commonwealth v. McCree,* 857 A.2d 188, 190 (Pa.Super.2004) (citations omitted), *appeal granted, Commonwealth v. McCree,* 583 Pa. 670, 876 A.2d 394 (May 09, 2005)(TABLE, No. 431 EAL 2004). When discussing the plain view exception to the warrant requirement in *McCree, supra,* however, this Court observed that the applicable standard was not quite as clear. We noted that the United States Supreme Court extensively discussed the plain view exception in *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). For the exception to be present, initially, the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Moreover, two additional conditions must be satisfied to justify the warrantless seizure. First, the incriminating character of the item must be "immediately apparent." Also, the officer must have a lawful right of access to the object itself. *Commonwealth v. McCree,* 857 A.2d 188, 190 (Pa.Super.2004) (*citing Horton,* 496 U.S. at 137, 110 S.Ct. 2301 (citations omitted)).

¶ 21 Pennsylvania adopted the aforementioned standard when our Supreme Court directly quoted *Horton, supra,* in *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313, 320 (1992). Nevertheless, as we noted in *McCree,* 857 A.2d at 190–191, our Supreme Court later modified the *Horton/McCullum* plain view exception in *Commonwealth v. Ellis,* 541 Pa. 285, 662 A.2d 1043 (1995) and seemingly abandoned its final prong which required the police to have a lawful right to access the contraband in plain view. After a discussion of

the latter case and others which followed, we stated "[w]e are constrained to apply the *Ellis/Petroll* exception." *McCree,* 857 A.2d at 191. In *Ellis, supra,* the Court stated under the plain view doctrine, the warrantless seizure of a piece of evidence which is in plain view is permissible when just two criteria are met:

First, the evidence must be seen from a lawful vantage point. Second, it must be immediately apparent to the viewer that the object observed is incriminating evidence. In other words, the observing officer must have probable cause to believe the evidence in question is contraband or incriminating evidence. *See Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

*Ellis,* 541 Pa. at 297–298, 662 A.2d at 1049. *See Commonwealth v. Petroll,* 558 Pa. 565, 738 A.2d 993 (1999); *Commonwealth v. Colon,* 777 A.2d 1097 (Pa.Super.2001).

¶ 22 As in the case *sub judice,* both *Petroll* and *Colon, supra,* involved seizures of items from vehicles that were observed in plain view from a vantage point outside the vehicle, and in both cases the seizures were upheld. In *McCree,* 857 A.2d at 191, we found that "under *Colon,* police officers might be prohibited from searching a vehicle once the occupants have been removed, but the officers are not prohibited from seizing contraband observed in plain view after a lawful stop." We also found that "[w]ith respect to the position of the police officer when the item is observed, *Petroll* merely requires that the officer be in a 'lawful vantage point.'" *McCree,* 857 A.2d at 191.

¶ 23 When applying the extensive analysis summarized above to the facts before us in *McCree, supra,* we found pill bottles to be in plain view, despite the fact that the appellant concealed one under a seat cushion and two others were found in the door pocket after the appellant had been removed from the car. The officers who seized the pill bottles the appellant was attempting to suppress were working back-up to an officer who notified them she believed a narcotics sale was in progress in a blue Pontiac, tag number DFZ3789. One officer approached the driver's side while his partner approached the passenger side. The former saw the appellant sitting in the driver's side of the vehicle and observed him shove an orange/amber container under the seat cushion of the car, which he believed to be a pill bottle. After the appellant was removed from the car, he reached under the seat and retrieved the bottle. While the appellant was placed under arrest at the back of the vehicle, the same officer saw two additional pill jars in the door pocket, in that the door had been left open. *McCree,* 857 A.2d at 189.

¶ 24 As has been discussed, *infra,* Officers Washington and Fairbanks were approximately 12 to 13 blocks away from the Pep Boys traveling eastbound when Officer Washington first observed the vehicle traveling westbound with a male driving and wearing a blue hoodie. He also noticed that the inspection on the vehicle had expired in July of 2001. N.T., 10/22/02 at 10–11. Officer Washington described the vehicle as a "Chevy SUV. It's silver on the top part, and there was maroon toward the bottom of it." N.T., 10/22/02, at 14.

¶ 25 When Officer Washington approached and repeatedly requested that he provide identification for himself or the vehicle, Appellant refused to do so and reached "down toward in between the seat." N.T., 10/22/02, at 13–14. Concerned for his safety, Officer Washington asked Appellant to step out and come to the rear of the vehicle. When he did so, Officer Washington observed a silver

handgun "between the seat and the console, on the floor but under the seat." N.T., 10/22/02, at 14. Officer Washington was standing in the doorway of the vehicle. N.T., 10/22/02, at 14. He notified his partner, Officer Fairbanks, about the weapon and the latter retrieved a "silver and brown with black electrical tape" toy handgun. N.T., 10/22/02, at 14–15. Officer Washington agreed on cross-examination that the plastic gun actually had black electrical tape around the entire part of the gun. N.T., 10/22/02, at 26.

¶ 26 In the case *sub judice*, the above-cited testimony establishes that Officers Washington and Fairbanks had ample reason to make an investigatory stop. They had information regarding an armed robbery in close proximity to where they first observed Appellant which was said to be committed by a perpetrator whose vehicle and physical description matched that of Appellant. In addition, Officer Washington observed the vehicle's registration had clearly expired. Section 6308(b) of the Motor Vehicle Code provides that when an officer has reasonable and articulable suspicion of a Motor Vehicle Code violation, he or she may stop the vehicle for the purpose of checking specifically enumerated documents, including registration and driver's license, or to secure other information he or she believes is reasonably necessary to enforce the Motor Vehicle Code. 75 Pa.C.S.A. § 6308(b). As the trial court correctly noted, Officer Washington made an inadvertent observation of the gun on the floor of the car when he asked Appellant to step out of the vehicle and had probable cause to believe it was evidence of a crime in light of the recently reported robbery. Trial Court Opinion filed 12/2/04, at 6. As such, the trial court correctly denied the motion to suppress both the Chevrolet SUV and the toy gun.

¶ 27 Appellant's final two matters to be raised on appeal concern the sentencing court's jurisdiction to impose an enhanced sentence of twenty-five (25) years to fifty (50) years in prison. Appellant argues the robbery information did not allege the prior convictions necessary for enlarging the statutory maximum. In addition, Appellant claims the "three strikes" statute, 42 Pa.C.S.A § 9714, which enlarges the statutory maximum and permits the sentencing judge, rather than the jury, to make the factual determination that a defendant is subject to its provisions based upon a preponderance of the evidence, and not proof beyond a reasonable doubt, violates the Pennsylvania and United States Constitutions.

¶ 28 While 42 Pa.C.S.A. § 9714(a)(2) does not require an offender to know of the penalties prescribed under its terms and permits a sentencing court to sentence a recidivist to life imprisonment without parole, its language provides no discretion with regard to an individual who had been convicted of two crimes of violence that arose from separate, criminal transactions prior to the commission of the current offense. 42 Pa.C.S.A. § 9714(a)(2). In such a circumstance, the statute mandates "the person shall be sentenced to a minimum sentence of at least 25 years of total confinement, notwithstanding any other provision of this title or other statute to the contrary." 42 Pa.C.S.A. § 9714(a)(2). A "crime of violence" as the term is used in 42 Pa.C.S.A. § 9714 applies, *inter alia*, to "robbery as defined in 18 Pa.C.S. § 3701(a)(i)(ii) or (iii) (relating to robbery), or robbery of a motor vehicle." 42 Pa. C.S.A. § 9714(g).

¶ 29 Prior to imposing a sentence on an offender under 42 Pa.C.S.A. § 9714(a), the sentencing court:

shall have a complete record of the previous convictions of the offender, copies

of which shall be furnished to the offender.... The court shall then determine, by a preponderance of the evidence, the previous convictions of the offender and, if this section is applicable, shall impose sentence in accordance with this section.

42 Pa.C.S.A. § 9714(d) (emphasis added).

In sentencing Appellant, the trial court stated the following:

Adult probation and parole provided this court in January of 2003, prior to sentencing, a complete criminal history. This court, prior to sentencing, provided the Commonwealth and the defense counsel with a copy of this report. The report chronicled the extensive criminal record of the defendant dating back to September of 1970 to the present. The appellant has seven (7) known adult arrest [sic], six (6) prior convictions, and six (6) commitments. He was arrested and convicted for [sic] three (3) F–3 robberies, two (2) F–2 robberies and one (1) F–1 robbery. The uncontested information provided to this court was sufficient to give this court jurisdiction to impose an enhanced sentence.

Trial Court Opinion filed 12/2/04, at 6–7.[6]

¶ 30 Clearly, the aforementioned robbery convictions qualify as crimes of violence. Consequently, Appellant's prior arrest and conviction history dictate that he receive the prison term the sentencing court handed him.

¶ 31 Counsel for Appellant indicated an understanding of the sentencing court's obligation to apply 42 Pa.C.S.A. § 9714(d) and expressed her client's awareness of its implications to the sentencing court just prior to sentencing:

Your Honor, I understand that Mr. Harris understands the implication of the third strike law. And there's not a whole lot I can say opposed to whether or not third strike applies in this case. And I was in fact given notice that the Commonwealth would be seeking to move pursuant to the third strike... you know, I am not in a position to argue that in fact this is not a third strike... I know that the Court, despite whether or not the Court would want to deviate, has no choice but to impose the mandatory minimum of 25 years. I would just ask the Court to not impose any more than that.

N.T., 2/2/04, at 4–5.

¶ 32 Counsel's statement evinces Appellant was notified of the Commonwealth's intention to seek the mandatory sentence and the docketing statement shows the sentencing court deferred sentencing four (4) times after ordering presentence, psychiatric, and mental reports on November 12, 2003. Further, the sentencing court indicated in its Opinion that, prior to sentencing, the court provided both the Commonwealth and Appellant's counsel with a copy of this report. Trial Court Opinion filed 12/2/04, at 6–7. In light of the foregoing, we find the procedures provided for by 42 Pa.C.S.A. § 9714 were carefully observed and Appellant's rights were strictly safeguarded. As such, we find Appellant's argument to the contrary herein without merit.

¶ 33 Finally, Appellant asserts that 42 Pa.C.S.A. § 9714 violates the Pennsylvania and United States Constitutions in

---

6. A pre-sentence report was not initially contained in the certified record; however, the Commonwealth indicated in its brief it had filed a Motion to Correct an Omission in the Record pursuant to PA.R.A.P. 1926, and also affixed a copy of it as "Exhibit A" to its brief.

Appellee's Brief at 15. Subsequently, this Court granted the Application for Correction of Original Record and a sealed, supplemental record containing the pre-sentence investigation report was received on August 3, 2005.

that it directs the factual determinations regarding the "existence and particulars" of any prior convictions be determined by a judge based upon a preponderance of the evidence. The United States Supreme Court has considered the constitutionality of sentence enhancing statutes and has held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (U.S. 2000).

¶ 34 Appellant herein disputes the fact of his prior convictions on the ground that a judge, not a jury, has made factual determinations concerning them; however, *Apprendi, supra*, does not mandate a jury inquiry concerning previous convictions. Rather, the Supreme Court explicitly exempted the existence of prior convictions from the mandate of jury consideration when sentencing enhancement is an issue. When considering the propriety of a sentencing enhancement in the wake of *Apprendi, supra*, this Court has determined that it is appropriate to employ a multipart analysis. *Commonwealth v. Lowery*, 784 A.2d 795, 799 (Pa.Super.2001). First, we must ascertain whether the enhanced sentence exceeded the statutory maximum for the crime for which the defendant was convicted. If it did, the next question is whether the enhanced sentence was based upon the fact of a prior conviction. If it was, then the sentence is constitutional. If it was not, then the sentence is unconstitutional. *Id. (citing United States v. Williams*, 235 F.3d 858, 863 n. 4 (3d Cir. 2000)).

¶ 35 The record herein reflects Appellant was convicted of Robbery under 18 Pa.C.S.A. § 3701. Such is a felony of the first degree. The statutory maximum for a felony of the first degree is twenty (20) years in prison. 18 Pa.C.S.A. § 1103(1). The sentencing court's sentence of twenty-five (25) to fifty (50) years in prison clearly is outside of this statutory maximum; nevertheless, the enhancement factor was predicated solely upon the existence of one or more prior convictions. Thus, under this Court's interpretation of *Apprendi, supra*, Appellant's sentence is constitutionally firm; Appellant was not entitled to have a jury determine whether he was a recidivist, and we can grant no relief on this claim.

¶ 36 Judgment of sentence affirmed.