591 A.2d 1075

**COMMONWEALTH of Pennsylvania**

v.

**George PATTERSON, Appellant.**

Superior Court of Pennsylvania.

Argued April 16, 1991.

Filed May 29, 1991.

18

Paul George, Philadelphia, for appellant.

Michael Erlich, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before MONTEMURO, BECK and TAMILIA, JJ.

TAMILIA, Judge.

This is an appeal from an August 24, 1990 judgment of sentence imposed following jury convictions for possession of a controlled substance,[1] possession with intent to distribute,[2] carrying a firearm without a license [3] and carrying a firearm in a public place.[4] Appellant was sentenced to serve fifteen (15) to thirty (30) months imprisonment on the drug charges and a consecutive twelve (12) to twenty-four (24) month sentence on the firearms charges.

1. 35 P.S. § 780–113 *et seq.*
2. *Id.*
3. *Id.,* § 6106.
4. *Id.,* § 6108.

■ Appellant's sole argument on appeal is the trial court erred in denying appellant's motion to suppress physical evidence. Our standard of review on appeal from a suppression ruling is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are in error. *Commonwealth v. Morgan*, 517 Pa. 93, 534 A.2d 1054 (1987).

On September 3, 1988, Philadelphia Police Officers Marykowitz and Malkowski were assigned to patrol an alley behind the 7500 block of North 20th Street in North Philadelphia. Neighbors residing on the block had lodged numerous complaints concerning illicit drug sales being sold from 7510 North 20th Street. The modus operandi of the drug peddlers was to exchange money for drugs through a small hole in the rear door of the residence facing a driveway which connected the house to a back alley.

In between responding to radio calls and other patrol related assignments, Marykowitz and Malkowski drove their marked police vehicle to the rear driveway of 7510 North 20th Street. Between 2:30 and 4:30 a.m., they observed five people enter the rear driveway of the home and bang on the back door. No one ever answered. In each case, police approached and questioned the individuals. The police became suspicious that criminal activity was afoot when the individuals standing around creating noise in the dark alley entrance of a reputed crack house were unable to offer logical reasons to explain their presence. Fearing for their safety, the officers conducted a pat-down search for weapons. None were found and the individuals were not detained.

Somewhere between 4:30 and 4:55 a.m. police returned to the rear of the 7510 North 20th Street residence to find appellant creating a disturbance by banging on the rear door of this known illicit drug location. Police approached appellant and asked what he was doing. Appellant responded he had come to see someone. Fearing for their safety in the dark early morning hours, the officers frisked appellant.

Their suspicions were confirmed, for concealed in appellant's waistband was a nine millimeter handgun, with ten live rounds of ammunition in the clip. After this discovery, they arrested appellant, searched him and found 54 vials of crack cocaine and $220 in cash.

Pursuant to the landmark decision of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may temporarily detain a person if he observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot.

The officer [making a *Terry* stop] ... must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."' [*Terry*, 392 U.S.,] at 27 [88 S.Ct. 1868, at 1883, 20 L.Ed.2d 889]. The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. *INS v. Delgado*, 466 U.S. 210, 217 [104 S.Ct. 1758, 1763, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found,' [*Illinois v. Gates*, 462 U.S. 213, at 238 [103 S.Ct. 2317, at 2332, 76 L.Ed.2d 527]] and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause.

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* [407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)], supra, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a Terry stop. 407 U.S., at 147, 92 S.Ct.

1921, at 1923, 32 L.Ed.2d 612. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion.

*Ala. v. White,* —— U.S. ——, —— - ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 308–09 (1990).

 In the instant matter, police received numerous complaints regarding drug sales conducted from the back door of 7510 North 20th Street. These tips were corroborated by suspicious activity occurring in the alley behind the house the evening of the appellant's arrest. Within a two hour period in the early morning hours of September 3, 1988, police witnessed five suspicious looking subjects approach and knock on the rear door of the crack house, waiting for someone to answer. When asked, none of the individuals could explain to police for what reason or why they were there. Appellant was the sixth person within two and one-half hours to enter the alley and knock on the crack house door. The combination of the neighbors' reports and the suspicious heavy foot traffic during the wee hours of the morning in the dark back alley of a suspected crack house is sufficient to justify a stop. *See Commonwealth v. Moore,* 300 Pa.Super. 488, 446 A.2d 960 (1982).

 We now turn to the question of whether the police frisk incident to the investigatory stop violated appellant's fourth amendment rights. To justify a frisk incident to an investigatory stop, the police need to point to specific and articulable facts indicating the person they intend to frisk may be armed and dangerous; otherwise, the talismanic use of the phrase "for our own protection," a phrase invoked by the officers in this case, becomes meaningless. *See also Commonwealth v. Jackson,* 359 Pa.Super. 433, 519 A.2d 427 (1986). Here, the stop and frisk took place in the

middle of the night in the back alley entrance of a reputed crack house. The police may reasonably believe themselves to be in danger when the hour is late or the location is desolate. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985); *Commonwealth v. Prengle*, 293 Pa.Super. 64, 70 n. 5, 437 A.2d 992, 995 n. 5 (1981); *Jackson, supra.*

Today we additionally join the growing number of courts who have taken judicial notice of the fact drug dealers are likely to be armed and dangerous. *See United States v. Adams*, 759 F.2d 1099, 1109 (3d Cir.1985); *Commonwealth v. Davidson*, 389 Pa.Super. 166, 566 A.2d 897 (1989), *alloc. denied*, 525 Pa. 624, 578 A.2d 412 (1990) (it is well known that the distribution of narcotics is often punctuated by acts of violence involving various lethal weapons); *United States v. Morales*, 549 F.Supp. 217 (S.D.N.Y.1982) (to substantial dealers in narcotics, firearms are as much tools of the trade as are most commonly recognized articles of narcotics paraphernalia); *United States v. Wiener*, 534 F.2d 15 (2d Cir.1976); *United States v. Barlin*, 686 F.2d 81 (2d Cir.1982) (an officer's actions should be measured against a background which includes the violent nature of narcotics crimes). Accordingly, the search incident to the stop was justified, for the safety of the officers was served by the minimal governmental intrusion on appellant's person. In *Commonwealth v. Rodriquez*, 387 Pa.Super. 271, 280–81, 564 A.2d 174, 179 (1989), this Court stated:

The justification for such conduct has its roots in the seriousness with which drug curtailment has been approached by our society. The needless loss of life attendant to the illegal drug industry is all too well documented in the newspapers as a virus which reeks havoc on users, distributors and law enforcers.[5] As noted by one court on this ever increasing scourge that plagues our society:

5. In *Commonwealth v. Davidson*, 389 Pa.Super. 166, 566 A.2d 897 (1989), this Court pointed out:

Although the suspicion of narcotics possession and distribution is not universally recognized as a circumstance which, standing alone, gives rise to an inference of dangerousness, we believe that the better view is that it does. *See [United States v.] Post*, 607 F.2d [847] at 851 [9th Cir.1979]. The Supreme Court implied as much in *[Michigan v.] Summers* [452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340] [ (1981) ] when it stated: "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." 452 U.S. at 702, 101 S.Ct. at 2594.

We hold, therefore, even though the officers who detained [the defendant] had no information that he was armed or that he had a past history of violence, they acted reasonably when conducting a protective patdown search for weapons in light of the fact that they had a reasonable suspicion that Williams was presently engaged in narcotics distribution. To hold otherwise would be an invitation to violence in what is always a potentially explosive situation.

*Williams v. Com.*, supra, [4 Va.App. 53], 354 S.E.2d [79] at 87 [ (1987) ] (Citations omitted).

*Id.*, 387 Pa.Superior Ct. at 280–81, 564 A.2d at 179.

█ Once discovering the gun, police had probable cause to arrest. In conducting a search incident to the arrest, police recovered the crack cocaine and $220 in cash. Accordingly, the evidence was admissible.

Judgment of sentence affirmed.

BECK, J., concurs in the result.

---

Of the 402 homicides in Philadelphia in 1988, nearly 100 were known to be drug related; of the 335 homicides in 1987, at least 77 were drug related. *See* Boubion "City's Murder Rate on Record Race," *Philadelphia Daily News*, at 11 (March 20, 1989); Samuel, "Three Weekend Homicides Bring Philadelphia Total to 108[.]" *Id.* 389 Pa.Super. at 173, 566 A.2d at 900 n. 2.